UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES BLANCHARD,

              Plaintiff,                         Civil Action No. 11-cv-12595

        v.                              District Judge John Corbett O'Meara
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

       Plaintiff Charles Blanchard brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 8, 11), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

## I. RECOMMENDATION

       For the reasons set forth below, this Court finds that some of the ALJ's reasons for discounting Plaintiff's testimony were either unsupported by substantial evidence or did not undermine Plaintiff's credibility. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART, that Defendant's Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II.  REPORT

### A.  Procedural History

On May 21, 2008, Plaintiff filed an application for DIB asserting that he became unable to work on April 24, 2007.  (Tr. 14.)   The Commissioner initially denied Plaintiff's disability application on July 29, 2008.  (Tr. 14.)  Plaintiff then filed a request for a hearing, and on March 12, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Daniel G. Berk, who considered the case *de novo*.  (*See* Tr. 14-22, 50-72.)  In an April 26, 2010 decision, ALJ Berk found that Plaintiff was not disabled.  (Tr. 14-22.)  The ALJ's decision became the final decision of the Commissioner on April 19, 2011 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.)  Plaintiff filed this appeal on June 15, 2011.  (Dkt. 1.)

### B.  Background

Plaintiff worked for U-Haul for 14 years, most recently as an assistant manager of a store in Port Huron, Michigan.  (Tr. 54-55, 63.)   In that role, he rented and maintained U-Haul trucks. (Tr. 54.)  At the time of the ALJ's disability determination, Plaintiff was 43 years old.  (*See* Tr. 14, 53.)   Plaintiff holds two associates degrees: one in business, the other in software engineering.  (Tr. 54.)

#### 1.  The Hearing Before the ALJ

##### (a) Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that he took a leave of absence from U-Haul for diverticulitis-related surgery in April 2007.  (Tr. 55.)  He stated that following his surgery, he "developed a blood clot in both lungs and in [his] left leg."  (Tr. 55.)  Plaintiff also testified to low-back pain that can at times feel like a "stabbing[,] shooting pain[.]"   (Tr. 56.)  Plaintiff attested to

left-calf pain (apparently related to his lower-back condition) that "feels like somebody's taking a knife [to it], or it feels like it's going to explode."  (Tr. 58.)

Plaintiff also told the ALJ that he began suffering from multiple sclerosis in May 2009.  (Tr. 59-60.)  As a result of that disease, Plaintiff said his "right arm is numb from the elbow down to the fingertips."  (Tr. 60)  And "[my] [l]eft hand fingertips are numb, and the feet feel like they're on fire . . . .  The sensations never go away.  I have them 24/7."  (Tr. 60.)  Plaintiff explained that "it feels like I am running my hands over razor blades."  (Tr. 60.)  He said that he is able to complete basic tasks like typing on a computer or washing dishes for about two or three hours before his right hand loses function.  (Tr. 60.)  Plaintiff testified that he could lift "ten to fifteen pounds max."  (Tr. 56.)

Plaintiff also described other functional limitations.  Plaintiff testified that after two hours of standing it "[f]eels like there's a knife in my lower back."  (Tr. 56.)  At that point, he would need to lay almost flat for a "couple hours" before he could stand again.  (Tr. 56.)  Plaintiff said that if he were unable to lie down, he could stand for a total of four hours in a day "without being in severe pain."  (Tr. 57.)  He also stated that he could sit for four hours in a day without needing to recline.  (Tr. 57.)  Plaintiff testified, however, that if he were  sitting, standing, or lifting, he would begin to experience severe pain in his left calf within a half-hour.  (Tr. 58-59.)  He also said that he experienced low-back pain at a 5-out-of-10 level after minimal activity.  (Tr. 59.)  Plaintiff stated that when he is in pain, he has difficulty concentrating on something other than the pain.  (Tr. 62.)

As far as his activities of daily living, Plaintiff sleeps only four to five hours at night due to pain.  (Tr. 62.)  He takes naps five days per week, each for two to three hours.  (Tr. 61.)  On a "bad day" Plaintiff said he wakes up and lets his dogs out.  (Tr. 61.)  He continued, "[a]nd then I go sit

in my chair pretty much all the day.  And the only time I get up is to grab something to eat or to go to the bathroom, or let the dogs out, or go back and lay down in bed."  (Tr. 62.)  Plaintiff testified that he experiences these types of days two or three times per week.  (Tr. 62.)

### (b) Vocational Expert's Testimony

A vocational expert ("VE") also testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience with the ability to perform "at the light exertional level" with a sit-stand option.  (Tr. 65.)  The VE stated that such a person could work doing inspection, hand assembly, hand packaging, and sorting tasks.  (Tr. 66.)  She stated that there would be 20,000 such jobs in the state.  (*Id.*)  The ALJ then asked the VE if there would be jobs available for someone of Plaintiff's age, education, and work experience with the ability to perform "sedentary" work with a sit-stand option.  (*Id.*)  The VE testified that there would be "a similar clustering of the types of jobs that I just mentioned relative [t]o industrial manufacturing occupations."  (Tr. 67.)  She stated that there would be 10,000 such jobs in the state.  (Tr. 67.)  As a third hypothetical, the ALJ asked the VE to assume that Plaintiff's testimony was entirely credible.  (Tr. 67.)  The VE stated that if all of Plaintiff's testimony was credited, work would be precluded.  (*Id.*)

### 2.  Medical Evidence

#### (a) Complications Post Surgery

In April 2007, Plaintiff underwent colon resection surgery for diverticulitis.  (Tr. 207, 218-19.)  About a month later, beginning on May 28, 2007, Plaintiff was hospitalized for four days.  (Tr. 171-73.)  Plaintiff presented with a fever, left-calf pain, and a sore throat.  (Tr. 171.)  An

ultrasound revealed a deep venous thrombosis[1] of the left lower extremity, specifically, the left superficial femoral, popliteal, and posterior tibial veins. (Tr. 171.) Plaintiff was prescribed Coumadin, an anticoagulant. (Tr. 172.)

*(b) Dr. Howard Bortman*

In June 2007, Dr. Howard Bortman, a family medicine practitioner, completed a disability form for Oxford Life Insurance Company. He indicated that Plaintiff had "complications from colon resection" and could not work. (Tr. 298.) Dr. Bortman estimated, however, that Plaintiff would be able to return to desk work in August 2007 and to his usual occupation in September 2007. (Tr. 298.)

On August 31, 2007, Dr. Bortman performed an ultrasound of Plaintiff's left lower extremity. He found that there was "incomplete compression with flow seen with augmentation within the popliteal vein suggestive of chronic changes." (Tr. 242.) Dr. Bortman noted, however, that the ultrasound did not evidence a deep venous thrombosis. (*Id.*) That same day, Dr. Bortman completed another form for Oxford Life and noted that Plaintiff could return to desk work with a sit-stand option on September 4, 2007, and that he could return to his "usual occupation" on March 4, 2008. (Tr. 297.)

In November 2007, Plaintiff underwent several MRIs of his lower back. (Tr. 240-41.) The first set of images revealed "disc space narrowing" between L5 and S1 and "minimal facet

---

[1]A.D.A.M. Medical Encyclopedia, *Deep Venous Thrombosis* (last reviewed Feb. 13, 2011) *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001209/ ("Deep venous thrombosis is the formation of a blood clot in a vein that is deep inside a part of the body, usually the legs . . . . The clot can block blood flow and cause swelling and pain.").

arthropathy"[2] in the L5-S1 and L4-L5 regions.  (Tr. 241.)  The physician also noted "small anterior osteophytes."  (*Id.*)  No compression or deformity was identified.  (*Id.*)  The radiologist's impression of the second set of images was "mild diffuse bulging annulus[3] with mild facet[] changes on the right, producing slight narrowing of the right fourth foraminal canal."  (Tr. 240.)  The study also revealed "mild bulging annulus at the L3-4 level."  (*Id.*)

In December 2007, Dr. Bortman completed another disability form for Oxford.  (Tr. 295-96.) He indicated that Plaintiff could not sit, stand, or walk for "extended periods of time."  (Tr. 295.) Dr. Bortman also indicated that Plaintiff had the highest level of physical impairment: "Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary) activity (75-100%)."  (Tr. 296.)  He provided, however, that while Plaintiff was disabled from his regular occupation, he was not disabled from all occupations.  (Tr. 296.)

In March 2008, Dr. Bortman referred Plaintiff for a "Left Lower Extremity Duplex Study." (Tr. 235.)  That study revealed "[p]artial compression of the superficial femoral and popliteal veins." (Tr. 235.)  Later in the month, Dr. Bortman completed another form for Oxford.  (Tr. 293-94.)  As in December 2007, Dr. Bortman indicated the most severe ("Class 5") physical impairment but also indicated that Plaintiff was not disabled from all occupations.  (Tr. 294.)  He provided that Plaintiff

---

[2]*See* Dorland's Illustrated Medical Dictionary 160 (31 ed. 2007) (defining "arhtropathy" as "any joint disease").

[3]"The rubbery disks that lie between the vertebrae in your spine consist of a soft center (nucleus) surrounded by a tougher exterior (annulus)."  Mayo Clinic Staff, *Herniated Disks*, http://www.mayoclinic.com/health/medical/IM01274 (last visited Mar. 7, 2012).  "A bulging disk extends outside the space it should normally occupy. . . .  The part of the disk that's bulging is typically the tough outer layer of cartilage.  Usually bulging is considered part of the normal aging process of the disk and is common to see on MRIs of people in almost every age group."  Randy Sheleurd, M.D., MayoClinic.com, *Herniated Disk vs. Bulging Disk: What's the Difference?* (Feb. 3, 2011) *available at* http://www.mayoclinic.com/health/bulging-disk/AN00272.

should be re-evaluated in about a month regarding his ability to return to his regular position.  (*Id.*)

### (c) Dr. William Oppat

On March 19, 2008, Plaintiff, on referral from Dr. Bortman, had a medical consultation with Dr. William Oppat, a vascular surgeon.  (Tr. 230-31.)  At the time of that exam, Plaintiff weighed over 350 pounds.  (Tr. 231.)  Dr. Oppat noted that Plaintiff had been using knee-high compression stockings but prescribed thigh-high stockings: Dr. Oppat believed these would "improve his symptoms dramatically as the knee length ones tend to constrict at the level of the knee."  (Tr. 231.)  Dr. Oppat also recommended a venous duplex examination "to [evaluate] the severity of his incompetence and venous reflux."  (Tr. 231.)  A March 31, 2008 lower-limb venous duplex revealed "[i]ncompetence . . . in the lesser saphenous vein . . . and in the distal femoral and popliteal veins . . . ."  (Tr. 232.)

On April 14, 2008, Plaintiff returned to Dr. Oppat to discuss test results.  (Tr. 228-29.)  Dr. Oppat noted that Plaintiff had "only been semi-compliant with [the thigh-high] compression stockings, and like all patients [he] finds them incredibly frustrating to wear."  (Tr. 228.)  Dr. Oppat also remarked, "The compression stockings are the mainstay of therapy coupled with leg elevation whenever possible."  (Tr. 228.)  Dr. Oppat recommended a "venography to access for a central venous obstruction."  (*Id.*)  An April 23, 2008 venography revealed "mild linear impression upon the lateral wall of the left common iliac vein" but "no evidence of collateral vessel formation, stenosis, or intraluminal thromus."  (Tr. 269.)

*(d) Dr. Fourad Batah (State Disability Determination Services)*

On July 10, 2008, Dr. Fouad Batah performed a consultative exam on behalf of the State Disability Determination Services ("DDS"). (Tr. 278.) Plaintiff reported numbness in his toes and the calf area and pain if he walked or stood for long hours. (Tr. 278.) Dr. Batah noted no edema or cyanosis in Plaintiff's extremities nor any calf tenderness. (Tr. 279.) He also found that Plaintiff had good reflexes, was able to get on and off the examination table without difficulty, and was able to bend, squat, and walk on his toes and heels without difficulty. (Tr. 279.)

*(e) Dr. R.H. Digby (State Disability Determination Services)*

On July 29, 2008, Dr. R.H. Digby completed a review of Plaintiff's medical file, including Dr. Batah's exam notes, for the State DDS. (Tr. 285-92.) Essentially, Dr. Digby found that Plaintiff was capable of light work (including standing or walking for six hours in an eight-hour day and lifting 20 pounds occasionally) except that Plaintiff could only "occasionally" engage in climbing, balancing, stooping, kneeling, crouching, or crawling, and should avoid even moderate exposure to hazards. (Tr. 287-89.)

*(f) Dr. Maury Ellenberg*

Around November 2008, Dr. Bortman referred Plaintiff to Dr. Maury Ellenberg. (Tr. 377.) On December 29, 2008, Dr. Paese examined Plaintiff on behalf of Dr. Ellenberg. (Tr. 377-79.) Plaintiff noted that he would experience pain in his left leg and toes when standing, walking, or sitting in an office chair for three to four hours. (Tr. 377.) On exam, Dr. Paese noted that Plaintiff had a normal gait, was able to heel and toe walk, and was able to squat and rise with "minimal assistance." (Tr. 378.) Plaintiff's patella reflex was 1+ bilaterally, however, his achilles and hamstring reflexes were "absent" bilaterally, and Plaintiff had some difficulty with left toe raises.

8

(Tr. 378.)  Dr. Pasea noted that Plaintiff's EMG test revealed "subtle, positive sharp waves and fibrillation at the extensor hallucis longus muscle [large toe extender] on the left."  (*Id.*)

In January 2009, Dr. Ellenberg noted that Plaintiff had a "good gait," was able to toe walk, but could not heel walk on his left foot as well as the right.  (Tr. 375.)  Upon reviewing one of Plaintiff's MRIs, Dr. Ellenberg provided that Plaintiff had "some L4-L5 foraminal[4] narrowing" but on the side opposite of his symptoms.  (Tr. 375.)  He recommended that Plaintiff undergo epidural steroid injections.  (*Id.*)

On January 26, 2009, Dr. Ellenberg noted that Plaintiff had obtained "at least 20%" improvement from an epidural injection.  However, in February 2009, Dr. Ellenberg explained,

> We have done two [epidural injections] so far and the relief is only transient.  We have not yet done the third in the series. [Mr. Blanchard] continues to be very frustrated by the pain and feels very limited by the pain.  He has been unable to work since April 2007.  He is unable to socialize normally.  He is unable to do his normal activities.  He cannot sleep through the night well.

(Tr. 372.)

On March 9, 2009, Dr. Ellenberg noted that Plaintiff had undergone the third injection which provided "a day or so of fairly good relief of pain" before Plaintiff "started getting extreme pain" down his left leg.  (Tr. 371.)  Dr. Ellenberg noted that Plaintiff was "walking in an awkward fashion with his left lower extremity" and recommended an "urgent" MRI.  (Tr. 371.)  That MRI revealed a bulging annulus at the L4-L5 level with no impingement and an "associated mild facet change, especially on the right, contributing to narrowing of the interior right fourth foraminal canal."

---

[4]"The foramen is the area in the vertebrae where the nerve roots exit."  Cleveland Clinic Website, *Spinal Stenosis*, http://my.clevelandclinic.org/disorders/spinal_stenosis/sp_overview.aspx (last checked Mar. 7, 2012).

(Tr. 369.)

On April 13, 2009, Dr. Ellenberg remarked that, because of an epidural shot, Plaintiff was "about 40% better." (Tr. 368.) He stated that the last MRI did not show "any specific impingement or area of impingement." (*Id.*) On exam, Plaintiff had a good gait but had difficulty heel walking with his left leg. (*Id.*) Dr. Ellenberg provided that Plaintiff had "[a]cute left L5 radiculopathy without structural abnormality." (*Id.*)

On May 5, 2009, Plaintiff returned to Dr. Ellenberg and, apparently for the first time, reported numbness in his right arm and clumsiness in his hand. (Tr. 367.) Dr. Ellenberg recommended a cervical MRI and an EMG. (*Id.*)

### (g) Hospitalization For Multiple Sclerosis Episode

On May 18, 2009, Plaintiff was admitted to the hospital. A cervical MRI showed abnormalities at C3-C4 and C5-C6 with a lesion at C4; the study also suggested "an inflammatory process, such as transverse myelitis or demyelinating disease." (Tr. 314.) A venous duplex study showed "chronic deep venous thrombosis . . . in the left popliteal vein." (Tr. 300.) On May 21, 2009, Plaintiff was discharged from the hospital. Dr. Jonathan Fellows, a neurologist, diagnosed Plaintiff with multiple sclerosis exacerbation[5] (along with diabetes, hypertension, and high

---

[5]The Mayo Clinic website provides:

> Multiple sclerosis (MS) is a potentially debilitating disease in which your body's immune system eats away at the protective sheath that covers your nerves. This interferes with the communication between your brain and the rest of your body. Ultimately, this may result in deterioration of the nerves themselves, a process that's not reversible.

> Symptoms vary widely, depending on the amount of damage and which nerves are affected. People with severe cases of multiple sclerosis may lose the ability to walk or speak. Multiple sclerosis can be difficult to diagnose early in the course of the disease because

10

cholesterol).  (Tr. 307.)  He prescribed a host of medications for Plaintiff's blood pressure and cholesterol.  (Tr. 309.)  He also prescribed prednisone and neurontin which, apparently, were to treat Plaintiff's multiple sclerosis symptoms.  (Tr. 309.)

### (h) Dr. Ronald Taylor and Occupational and Physical Therapy

On May 29, 2009, Dr. Ronald Taylor, a physical medicine and rehabilitation physician, examined Plaintiff because of his right-hand symptoms.  (Tr. 365-66.)  Dr. Taylor noted that Plaintiff's current episode of multiple sclerosis "began about a month and a half ago with paresthesias of the right hand which spread to both feet and became significantly more severe." (Tr. 365.)  He remarked that Plaintiff was "on a cortisone taper and most of [his] symptoms are improving."  (*Id.*)  Dr. Taylor's physical examination found mild decreased rapid alternating movements in the right hand, mild dystaxia, and mild pronator drift.  (*Id.*)  He concluded that Plaintiff had a "difficult clinical pattern" because of his multiple sclerosis, diabetic issues, and left S1 radiculopathy.  (Tr. 366.)  He recommended that Plaintiff follow up with his neurologist and that he begin therapy.  (*Id.*)

Plaintiff began occupational therapy for his right hand with Murray O'Laughlin, an occupational therapist, in June 2009.  (Tr. 363-64.)  Plaintiff reported pain at the 5-out-of-10 level. (*Id.*)  At the same time, Plaintiff started physical therapy with Michelle Kalil, a physical therapist. (Tr. 361-62.)  Plaintiff reported lower back pain that extended down into his left lower-extremity

---

symptoms often come and go – sometimes disappearing for months.

There's no cure for multiple sclerosis.  However treatments can help treat attacks, modify the course of the disease and treat symptoms.

Mayo Clinic Staff, *Multiple Sclerosis*, http://www.mayoclinic.com/health/multiple-sclerosis/ DS00188 (last visited Mar. 7, 2012).

11

at the 5-out-of-10 level.  (Tr. 361.)

On June 22, 2009, Plaintiff returned to Dr. Taylor with reports of right-hand numbness and pain and tingling in both feet.  (Tr. 359.)  Dr. Taylor's exam revealed diminished reflexes, slightly slowed rapid alternating movements, a hint of pronator drift on the left, and mild gait ataxia.[6]  (*Id.*)

In July 2009, after 12 treatment sessions, Plaintiff was discharged from occupational therapy. (Tr. 356.)  As compared to his pre-therapy condition, Plaintiff had resumed using his right hand for writing, typing, and feeding.  (*Id.*)  But therapist O'Laughlin noted that Plaintiff "demonstrates a severe sensory loss to [his right] hand" and that Plaintiff "needs to visually inspect what he is picking up and using to avoid dropping objects or misusing them."  (*Id.*)

In August 2009, Plaintiff was discharged from physical therapy.  Therapist Kalil noted that Plaintiff had increased his range of motion in his lumbar spine, increased his left-leg strength, Plaintiff's pain in his lumbar spine had decreased to 4-out-of-10, and Plaintiff had improved his gait pattern.  (Tr. 355.)

### (i) Dr. Marc Wittenberg

In October 2009, Plaintiff, on referral from Dr. Taylor, saw Dr. Marc Wittenberg.  (Tr. 342-44.)  Dr. Wittenberg noted that Plaintiff had tried Vicodin, physical therapy, epidural steroids, and neurontin "without significant help, except for the Vicodin."  (Tr. 342.)  On exam, Dr. Wittenberg found that Plaintiff was morbidly obese, had a slight antalgic gait, and had good sensation and strength in both lower extremities.  (Tr. 343.)  Dr. Wittenberg diagnosed Plaintiff with left lower extremity pain "possibly due to multiple sclerosis, as well as diskogenic involvement."  (*Id.*)  He

---

[6]"Ataxia describes a lack of muscle coordination during voluntary movements, such as walking or picking up objects." Mayo Clinic Staff, Ataxia, *available at* http://www.mayoclinic.com/health/ataxia/DS00910 (last visited Mar. 7, 2012).

recommended that Plaintiff come for a follow-up and, in response to Plaintiff's interest in spinal cord stimulation, that Plaintiff attend a stimulator class.  (*Id.*)

In December 2009, Plaintiff returned to Dr. Wittenberg.  (Tr. 331-32.)  Plaintiff continued to report low-back and left lower extremity pain but at a higher, 9-out-of-10 level.  (Tr. 331.)  On exam, Dr. Wittenberg found that Plaintiff had "good dorsi and plantar flexion bilaterally" and "had good sensation and strength in [both] lower extremities."  (*Id.*)  He prescribed Viocdin and had indicated that Plaintiff should have a follow-up visit in a month.  (*Id.*)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 24, 2007 – Plaintiff's alleged onset date. (Tr. 16.) At step two, the ALJ found that Plaintiff had the following severe impairments: "history of diverticulitis, deep vein thrombosis in the left leg, chronic venous insufficiency, low back pain, multiple sclerosis and obesity." (Tr. 16.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 16.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) except the claimant requires a sit/stand option at will." (Tr. 17.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 20.) At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: visual inspection, hand assembly, hand packaging or sorting. (Tr. 21.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

15

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

Plaintiff asserts that the ALJ erred in deciding his disability claim in five ways.  First, says Plaintiff, the ALJ failed to give proper consideration and weight to the opinions of two of his treating physicians: Dr. Oppat and Dr. Bortman.  (Pl.'s Mot. for Summ. J. at 8-10.)  Next, Plaintiff argues that the ALJ failed to consider the evaluations of his therapists: O'Laughlin and Kalil.  (*Id.* at 11-12.)  Third, Plaintiff claims that the ALJ provided inadequate reasons for relying on the findings of Dr. Rigby, the physician who reviewed Plaintiff's file for the State DDS.  (*Id.* at 11-13.)  Fourth, Plaintiff asserts that the ALJ erred at step two of the disability analysis by failing to find that Plaintiff's cervical stenosis and hypertension were severe impairments.  (*Id.* at 13-14.)  Fifth and finally, Plaintiff claims that the ALJ's decision to discount his credibility was erroneous and unsupported by substantial evidence.  (*Id.* at 14-19.)  Because the Court finds that this credibility argument is meritorious, the Court begins its analysis there.

*1. Some of the ALJ's Reasons for Discounting Plaintiff's Credibility Are Either Unsupported by Substantial Evidence or Do Not Undercut Plaintiff's Testimony*

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). However, an ALJ must not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186.  In fact, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).  Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.  Moreover, where an ALJ's reasoning underlying his decision to discount a claimant's credibility is partially, but not fully, flawed, remand  may be appropriate. *Allan v.*

17

*Comm'r of Soc. Sec.*, No. 10-CV-11651, 2011 WL 2670021 (E.D. Mich. July 8, 2011) (citing *Ford v. Astrue*, 518 F.3d 979, 982-983 (8th Cir. 2008)).

In *Allan*, the plaintiff suffered from low-back and leg pain; he testified that he was in "'constant pain' whether standing or sitting[,] . . . that he 'never [found] comfort or ease,'" and "did not believe that he could alternatively sit or stand for an eight-hour day without being able to lie down." 2011 WL 2670024, at *9 (Mar. 17, 2011) *recommendation rejected but facts adopted by* 2011 WL 2670021 (E.D. Mich. July 8, 2011). The ALJ gave three reasons for discounting the plaintiff's testimony. 2011 WL 2670021, at *2. First, the ALJ stated that diagnostic testing did not support the plaintiff's claim that his condition was worsening. *Id.* The Court found (and the Commissioner conceded) that this justification was problematic, however, because the ALJ had erroneously interpreted the diagnostic studies. *Id.* Second, the ALJ relied on an inconsistency between the plaintiff's testimony that steroid injections provided only a week of pain relief and the plaintiff's physician's testimony that the injections provided up to six months of relief. *Id.* The Court found that this was a valid basis for the ALJ to discount the plaintiff's credibility. *Id.* Third, the ALJ gave less weight to the plaintiff's allegations because of the plaintiff's activities of daily living. *Id.* at *3. But the Court found that the plaintiff's ability to drive a few miles, make simple meals, wash dishes for 10 to 15 minutes, and receive visits from family members did not "undercut the truthfulness of Plaintiff's allegations of pain." *Id.* Summarizing the foregoing, the Court concluded, "only one of the three reasons given by the ALJ for discounting Plaintiff's credibility is supported by substantial evidence. Because the other two are not, the Court remands this matter for further consideration." *Id.* (citing *Ford v. Astrue*, 518 F.3d 979, 982-983 (8th Cir. 2008)).

In this case, similar to *Allan*, the Court finds that two of the ALJ's reasons for discounting

Plaintiff's credibility either lack substantial evidentiary support or do not undermine Plaintiff's testimony.  First, the ALJ discounted Plaintiff's credibility because "[t]he medical evidence of record . . . indicates that the claimant's leg and back pain were significantly reduced with epidural injections."  (Tr. 20; *see also* Tr. 18 ("In 2009, the claimant received several epidural injections for his back and leg pain.  In May 2009, treating notes indicate that the claimant was doing reasonably well as far as his back and leg pain and the pain decreased after a second epidural injection.").)  On appeal, the Commissioner, citing to a doctor's notes (Tr. 365), adds that "as a result of his [May 2009] treatment, [Plaintiff's] calf pain had improved and his back pain had resolved."  (Def.'s Mot. for Summ. J. at 20-21.)

But a more complete reading of the record paints a different picture about the effectiveness of Plaintiff's epidural treatments.  In February 2009, Dr. Ellenberg stated:

> We have done two [epidural injections] so far and the relief is only transient.  We have not yet done the third in the series.  [Mr. Blanchard] continues to be very frustrated by the pain and feels very limited by the pain.  He has been unable to work since April 2007. He is unable to socialize normally.  He is unable to do his normal activities.  He cannot sleep through the night well.

(Tr. 372.)  In March 2009, Dr. Ellenberg noted that Plaintiff had undergone the third injection but that injection provided only "a day or so of fairly good relief of pain" before Plaintiff "started getting extreme pain" down his left leg.  (Tr. 371.)  In May 2009, as the Commissioner and the ALJ point out, Dr. Ellenberg stated that Plaintiff was "doing reasonably well as far as the back and leg" after an epidural.  (Tr. 367; *see also* Tr. 365 (another physician's statement that back pain had "resolved" from May 2009 injection).)  But Dr. Ellenberg also noted that Plaintiff "still does have the pain, which he had over the last two years" and that he "also will get some burning in his calf."  (Tr. 367.) And, at the end of his physical therapy in August 2009, Plaintiff reported having 4-out-of-10 pain

19

in his lower back with pain and numbness in his left lower extremity at night.  (Tr. 355.)  Most

importantly, however, in October 2009, Dr. Wittenberg noted that Plaintiff's

> pain is worse with standing, movement, and activity.  *His workup has included 5 epidural steroid injections, which ha[ve] not been helpful*. . . .  He describes left lower extremity pain that [gets] worse with standing, walking, sitting, and it decreases by decreasing his activity.  He has tried physical therapy epidural steroids, as well as Vicodin, *all without significant help*, except for the Vicodin.  He has also tried Neurontin without significant help.

(Tr. 342 (emphases added).)  In December 2009, Dr. Wittenberg reiterated: "He still complains of

low back pain and left lower extremity pain. . . .  He has tried epidural steroids as well.  Pain score

right now is a 9/10 and he does take any [*sic*] medications from a narcotic standpoint."  (Tr. 331.)

Given the foregoing, while the ALJ might have correctly concluded that the "claimant's leg

and back pain were significantly reduced with epidural injections" it is apparent that any pain relief

Plaintiff received was transient.  And the ALJ's conclusion is especially questionable given that the

most recent medical records – those from Dr. Wittenberg – went unmentioned by the ALJ.  (Tr. 331,

342.)  Accordingly, substantial evidence does not support the ALJ's assertion that "[t]he medical

evidence of record also indicates that the claimant's leg and back pain were significantly reduced

with epidural injections."  (Tr. 20.)

The ALJ also discounted Plaintiff's credibility because "most of the claimant's alleged

multiple sclerosis symptoms improved with a cortisone taper."  (Tr. 20.)  The ALJ's reference is to

Dr. Taylor's remarks at the end of May 2009:

> The current episode [of multiple sclerosis] began about a month and a half ago with paresthesias in the right hand which spread to both feet and became significantly more severe.  He was hospitalized and [an] MRI did show a cord lesion.  He is being followed by MIND [Medical Investigation of Neurodevelopmental Disorders] and will be started on immunomodulating therapy next week.  He is currently

20

on a cortisone taper and most of the symptoms are improving.

(Tr. 365.)

But contrary to the ALJ's claim, the record reflects that Plaintiff's right-hand limitations from his 2009 multiple-sclerosis episode persisted despite the cortisone taper. In June 2009, Plaintiff was not using his right hand to eat or write. (Tr. 356.) The Commissioner points out that in July 2009, however, Occupational Therapist O'Laughlin noted that Plaintiff had resumed using his right hand for writing, two-handed typing, and feeding; had resumed cooking, laundry, and light housekeeping; and had improved his grip and prehension strength. (Tr. 356.) But the Commissioner overlooks the fact that, in the very same discharge summary, O'Laughlin provided that Plaintiff "demonstrates a severe sensory loss to [his right] hand, [and] needs to visually inspect what he is picking up and using to avoid dropping objects or misusing them." (Tr. 356.) O'Laughlin also stated that Plaintiff's "numbness and pain in fingers/hands increases after a short period of time (5 minutes of activity)" and "pain and numbness increases steadily throughout the day in the dominant [right upper extremity]." (*Id.*)

To the extent that the Commissioner would argue that because O'Laughlin gave a mixed statement, substantial evidence supports the ALJ's cortisone-taper reason for discounting Plaintiff's credibility, the Court notes that O'Laughlin's summary must be contrasted against Plaintiff's testimony. Plaintiff in fact testified that he was able to complete basic tasks such as typing on the computer, washing dishes, and making the bed, and he testified that he was able to perform these tasks for two or three hours (before losing hand function for six to eight hours). (Tr. 60.) The Court fails to see how this testimony is inconsistent with the medical records after Plaintiff's multiple-sclerosis episode in April or May 2009. Accordingly, the Court finds that the ALJ unreasonably

21

concluded that Plaintiff's testimony – at least regarding his right-hand limitations – should be discounted because Plaintiff's "alleged multiple sclerosis symptoms improved with a cortisone taper."[7]

Despite the foregoing, the Court recognizes that *Allan* arguably presented more compelling facts for remand: there, the Commissioner conceded that one of the reasons the ALJ used to discount the plaintiff's credibility was based on the ALJ's erroneous interpretation of objective testing.  But any temptation to forgo a remand is quelled by the fact that the remaining reasons the ALJ provided for discounting Plaintiff's testimony are not particularly strong.  For one, the ALJ stated that at a consultative examination, "the claimant was able to perform most requested physical activities without any difficulties."  (Tr. 20.)  But the exam was given in July 2008 – well before Plaintiff's multiple-sclerosis episode.  For another, the ALJ stated that Plaintiff was not fully compliant with treatment which "suggests that the claimant's symptoms and allegations may not be as serious as alleged."  (Tr. 20); *see also* S.S.R. 96-7p, 1996 WL 374186 at *7 ("[An] individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").  But this partial non-compliance pertained to how often Plaintiff wore compression stockings and Dr. Oppat himself partially excused that non-compliance by noting that "like all patients [Mr. Blanchard] finds them incredibly frustrating to wear." (Tr. 228.)  Moreover, nothing suggests that Plaintiff did not subsequently

_____

[7]Notably, in providing one reason why work would be precluded if Plaintiff's testimony were credited, the VE stated: "he indicates that he's able to work with his hands for approximately two to three hours, and then he has to rest them for six to seven hours. If that's accepted as the way in which the Claimant needs to manage that particular problem, then obviously his hands would not be available for work use for the majority of the day."  (Tr. 68.)

comply with Dr. Oppat's prescription, and, as discussed, Plaintiff subsequently underwent a host of other treatments to alleviate lower-extremity pain. And, as with the consultative exam relied upon by the ALJ, Dr. Oppat's statements in April 2008 could not have undermined Plaintiff's testimony about his upper extremity limitations due to a multiple sclerosis episode in May 2009.

Thus, while a close case, this Court concludes that remand for the ALJ to reassess Plaintiff's credibility is warranted. On this record, the Court simply cannot tell whether, absent the weight the ALJ gave the to the curative effects of the epidural injections and cortisone taper, he would have found Plaintiff's testimony not credible. *See Allan*, 2011 WL 2670021, at *3 (citing *Ford*, 518 F.3d at 982-983).[8]

### 2. The ALJ Should Discuss Plaintiff's Therapists' Evaluations on Remand

Plaintiff asserts that the ALJ erred in failing to consider the evaluations of his occupational therapist, Mr. O'Laughlin, and his physical therapist, Ms. Kalil. Plaintiff recognizes that O'Laughlin and Kalil are not "acceptable medical sources" as defined in the Social Security Regulations but correctly points out that they are considered "other medical sources" under the Regulations and that an ALJ must "evaluate opinions from 'other medical sources.'" (Pl.'s Mot. for Summ. J. at 11 (citing S.S.R. 06-03p).) The Commissioner responds that the ALJ was not required to discuss every page in the administrative record, and, in any event, O'Laughlin and Kalil's discharge summaries in fact support the ALJ's decision. (Def.'s Mot. for Summ. J. at 13-14 (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).)

The Court does not quarrel with the proposition that the ALJ need not discuss every medical

---

[8]The Commissioner also argues that Plaintiff's activities of daily living undermine his credibility. But the ALJ did not provide that as a reason for discounting Plaintiff's credibility and it does not appear that this was a consideration in the ALJ's credibility determination.

report in the record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But case law also provides that an ALJ may not ignore an entire line of medical evidence. *See Hurst v. Sec'r of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984); *Ramey v. Astrue*, No. 2:10-CV-120, 2011 WL 882836, at *7 (Feb. 22, 2011) *report adopted by* 2011 WL 890995 (E.D. Tenn. Mar. 11, 2011). O'Laughlin and Kalil's evaluations, along with Dr. Wittenberg's notes (which the ALJ also failed to discuss), were arguably the most probative pieces of evidence regarding Plaintiff's condition after his multiple sclerosis attack in May 2009. In fact, O'Laughlin provided the only evaluation of Plaintiff's right-hand functionality after therapy. And, although the Commissioner correctly points out that some of O'Laughlin's summary "support[s] the ALJ's conclusion that Plaintiff's impairments were severe[] but not disabling" (Def.'s Mot. for Summ. J. at 13), as discussed, other aspects of his evaluation – including his notations of "demonstrate[d] severe sensory loss" and Plaintiff's pain after using his hand for "a short period of time" – supported Plaintiff's testimony (Tr. 356). Although in other cases the Court may find that the ALJ considered yet appropriately omitted a discussion of non-physician evaluations, in this case, that conclusion is unwarranted: the ALJ's omission contributed to his erroneous credibility determination. Accordingly, on remand, the ALJ should discuss O'Laughlin and Kalil's evaluations and state how they affect the disability determination.

### 3. Plaintiff Has Not Shown that the ALJ Reversibly Erred at Step Two

Plaintiff also argues that the ALJ erred at step two of the five-step disability determination process because he failed to conclude that Plaintiff's cervical stenosis and hypertension were severe impairments. In support of this claim, Plaintiff points out that at several office visits, including one as recent as December 2009, Plaintiff's blood pressure was high, and, further, the state agency's

24

physician's "impression" included "[h]ypertension, severe on medications." (*See* Pl.'s Mot. for Summ. J. at 14.) As for Plaintiff's cervical stenosis, Plaintiff cites a May 2009 MRI interpretation – the same interpretation suggesting multiple sclerosis – which provides: "moderate left C5-C6 neural foraminal narrowing and at least mild central canal stenosis at C3-4." (Tr. 349; *see also* Pl.'s for Mot. Summ. J. at 14.)

The Sixth Circuit has "characterized step two of the disability determination process as a 'de minimis hurdle'" *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs*, 880 F.2d at 862. Nonetheless, not every impairment is severe: "The mere existence of . . . impairments . . . does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930.[9] Further, the Sixth Circuit has "previously noted, albeit in an unpublished decision, that '[w]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment.'" *Despins*, 257 F. App'x at 930 (quoting *Long v.*

---

[9]The Social Security Regulations define basic work activities as

the abilities and aptitudes necessary to do most jobs. Examples of these include[:] (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

*Apfel*, 1 F. App'x 326, 331 (6th Cir. 2001)).

In this case, without citing to any record evidence, Plaintiff speculates that his "[h]ypertension contributed to his inability to sustain work activity and his overall declining state of health by exacerbating his symptoms and complicating his treatment." (Pl.'s Mot. Summ. J. at 14.) Plaintiff also asserts, again without citation to medical records, that "[m]oderate canal stenosis is more than [a] slight abnormality and was a likely contributor to [his] upper extremity difficulties and pain." (*Id.*) In light of Plaintiff's unsupported assertions, the Court agrees with the Commissioner that "Plaintiff has pointed to no credible medical evidence showing that hypertension and cervical stenosis impacted his work-related activities." (Def.'s Mot. for Summ. J. at 16; *accord id.* at 17.) Indeed, after the Commissioner's Motion raised this deficiency, Plaintiff has not responded with record support. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 3.) Instead, Plaintiff asserts that his hypertension and cervical stenosis "lend credibility to [his] allegations." (*Id.*) Accordingly, the Court does not find that Plaintiff has demonstrated that the ALJ reversibly erred at step two. *See Despins*, 257 F. App'x at 930. However, in reassessing Plaintiff's credibility on remand, the ALJ should consider the effect, if any, of Plaintiff's hypertension and cervical stenosis. *See* S.S.R. 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim.").

*4. Plaintiff Has Not Shown That the ALJ Reversibly Erred In Evaluating the Opinion Evidence of Record*

The Court addresses Plaintiff's remaining arguments together. Collectively, they assert that the ALJ erred in evaluating the opinion evidence of record. In particular, Plaintiff claims that (1) the ALJ improperly evaluated Dr. Bortman's opinion, (2) committed reversible error by failing to evaluate Dr. Oppat's statement that Plaintiff must elevate his legs when possible, and (3) failed to give adequate reasons for accepting the state agency physician's opinion. (Pl.'s Mot. for Summ. J. at 8-13.) The Court considers these arguments in turn.

In December 2007, Dr. Bortman indicated that out of five "Class" levels (with "Class 1" equating to no functional limitations), Plaintiff's physical impairment was a "Class 5": "Severe limitation of functional capacity; incapable of minimal (sedentary) activity (75-100%)." (Tr. 296.) On a March 2008 disability form, Dr. Bortman again indicated that Plaintiff had a "Class 5" physical impairment. (Tr. 294.) However, as noted by the ALJ, Dr. Bortman also indicated on both forms that Plaintiff was not disabled from "any occupation" – i.e., Dr. Bortman implied that there was some work that Plaintiff could perform. Indeed, about four months before his December 2007 opinion, Dr. Bortman provided that Plaintiff could, in less than a week, return to desk work (with a sit-stand option). (Tr. 297.) Thus, the ALJ reasonably concluded:

> The undersigned accords minimal weight to the opinion of Howard Bortman, D.O., who opined that the claimant has a severe limitation of functional capacity and is incapable of even sedentary activity. Dr. Bortman's opinion is severely discredited because his own report is contradictory. Later in his assessment he indicated that the claimant was "now disabled" from his regular occupation but was not "now disabled from any occupation."

(Tr. 20.)

Plaintiff concedes that "inconsistency is a valid factor in evaluation of a treating physician

27

opinion," and also partially acknowledges that Dr. Bortman's statements were not entirely accurate. (Pl.'s Mot. Summ. J. at 10); *see also Drumm v. Astrue*, No. 3:09-cv-62, 2010 WL 1258082, at *7 (Feb. 19, 2010) *report adopted by* 2010 WL 1258221 (S.D. Ohio Mar. 26, 2010) (holding that ALJ was not required to give treating physician opinions great weight where opinions were "internally inconsistent and not supported by his objective findings"); *Manning v. Astrue*, No. 06-407-JBC, 2008 WL 821896, at *2 (E.D. Ky. Mar. 25, 2008) ("A physician's opinion is given less weight if the opinion is not supported by the evidence, if it is not consistent with the record, or if it is internally inconsistent."). But Plaintiff's position is that the ALJ failed to consider other factors for evaluating a treating-source opinion as directed by the Social Security Regulations. In particular, if a treating source opinion is not accorded controlling weight, an ALJ "must apply" the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *accord* 20 C.F.R. § 404.1527(d). Plaintiff argues that had the ALJ considered these factors, they may have outweighed any inconsistency in Dr. Bortman's opinions.

The form of Plaintiff's argument is sound but Plaintiff has not convinced the Court that the premise is valid in this case: Plaintiff merely presumes without developed argument that the ALJ "failed to consider all of the factors in 20 C.F.R. § 404.1527." Admittedly, at the time of his March 2008 opinion, Dr. Bortman had seen Plaintiff for about 10 months and on a monthly basis. And Dr. Bortman did reference an ultrasound as objective evidence supporting his conclusions. These

factors favor giving Dr. Bortman's opinion more weight and, therefore, suggest that the ALJ did not consider them, as he must, in rejecting Dr. Bortman's opinion.  But, on the other hand, Dr. Bortman was not a specialist.  Further, a relatively contemporaneous state agency physician's exam and opinion contradicted Dr. Bortman's extreme "Class 5" limitation.  Moreover, Dr. Bortman offered no explanation as to why he believed in August 2007 that Plaintiff could soon return to desk work with a sit-stand option, but then, in December 2007, concluded that Plaintiff was incapable of even "minimal (sedentary) activity."  (*Compare* Tr. 296 *with* Tr. 297.)  These latter considerations favor giving Dr. Bortman's opinion less weight and thus suggest that the ALJ did in fact consider the 20 C.F.R. § 404.1527(d) factors.  Additionally, the ALJ explicitly stated that he "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527."  (Tr. 17.)

To be sure, it would have been preferable for the ALJ to have explicitly discussed each of the 20 C.F.R. § 404.1527 factors in his narrative.  However, it appears that the explanatory requirement that accompanies the treating source rule is not so demanding.  The procedural rule requires an ALJ to "provide 'good reasons' for discounting treating physicians' opinions, reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting S.S.R. 96-2p, 1996 WL 374188, at *5).  And while the Court of Appeals has stated that an ALJ must "apply," *Wilson*, 378 F.3d at 544, and "consider," *Rogers*, 486 F.3d at 242, the Section 404.1527 factors, Plaintiff has not cited, and the Court is not aware of, any binding authority requiring an ALJ to explicitly discuss each factor in his narrative.  As explained by another district court in this Circuit, there may be occasions where the ALJ has given the requisite "good reasons" for rejecting a treating-source opinion and has

29

considered the 20 C.F.R. § 404.1527 factors without explicitly discussing each such factor:

> Plaintiff asserts that the ALJ erred in failing to specifically articulate how each of the [20 C.F.R. § 404.1527(d)] factors influenced the weight he ultimately chose to give [his treating source's] opinion. The Court disagrees. . . .
>
> Although [the ALJ] did not explicitly address each of the factors set forth in 20 CFR § 404.1527(d), he did state that he had "considered opinion evidence in accordance with the requirements" of that provision, he expressly addressed both the supportability and consistency factors in detail, and he made clear the weight he ultimately gave [the treating-source] opinion. The Court finds this sufficient to satisfy the procedural requirements of 20 C.F.R. § 404.1527(d). *See Ray v. Astrue*, No. 3:09-cv-275, 2010 WL 2650718, at *7 (E.D. Tenn. July 2, 2010) (finding that the ALJ did not err in focusing only on the supportability and consistency factors to decide that the treating physician's opinion was not entitled to controlling weight); *see also Wamsley v. Astrue*, No. 09-cv-02811-CMA, 2011 WL 334454, at *6 (D. Colo. Jan. 31, 2011) ("If a treating physician's opinion is not given controlling weight, the ALJ must 'give good reasons' and consider a list of regulatory factors. Though the ALJ must consider these factors, he need not discuss all of them."); *McCoy v. Astrue*, No. 4:09-cv-517-A, 2010 WL 5812954, at *4 (N.D. Tex. Dec. 16, 2010) (explaining that the ALJ must "'consider' each of the factors set forth in section 404.1527(d) and articulate good reasons for its decision to accept or reject the treating physician's opinion," but that he "need not recite each factor as a litany in every case"); *accord Bergner v. Astrue*, No. 3:09-cv-242, 2010 WL 2710591, at *4 (N.D. Ind. July 7, 2010).

*Paseka v. Comm'r of Soc. Sec.*, No. 1:09-CV-1073, 2011 WL 883701, at *1-2 (W.D. Mich. Mar. 11, 2011); *accord Klimas v. Comm'r of Soc. Sec.*, No. 1:10-cv-666, 2012 WL 691702, at *1 (W.D. Mich. Mar. 1, 2012) ("The ALJ is not required, however, to explicitly discuss each of [the § 404.1527] factors. Instead, the record must reflect that the ALJ considered those factors relevant to his assessment." (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007))). Accordingly, on the facts of this case, the Court concludes that the ALJ did not commit reversible error in evaluating Dr. Bortman's opinions.

Next, Plaintiff argues that the ALJ erred in failing to evaluate the following statement from Dr. Oppat: "Mr. Blanchard has chronic venous insufficiency resulting from a previous left leg deep vein thrombosis.  The compression stockings are the mainstay of therapy coupled with *leg elevation whenever possible.*"  (Pl.'s Mot. for Summ. J. at 9; Tr. 228 (emphasis added).)  The Court finds that the ALJ did not err in this regard.

First, Dr. Oppat only treated Plaintiff for about one month and saw Plaintiff perhaps three times, and thus, arguably lacks the requisite longitudinal relationship of a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006).  Second, Dr. Oppat's statement was not even an "opinion."  The applicable Regulation provides, "Medical opinions are statements from physicians . . . *that reflect judgments about the nature and severity of your impairment(s)*, including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 1527(a)(2) (emphasis added).  Dr. Oppat's statement was medical advice for treatment; it is entirely ambiguous as to the severity of Plaintiff's impairment or Plaintiff's functional capacity despite his impairment.  Third, even if the Court were to conclude that Dr. Oppat's statement was an "opinion," it is not clear how it is inconsistent with the ALJ's RFC assessment.  Plaintiff would have the Court read Dr. Oppat's prescription as requiring Plaintiff to elevate his legs all the time, most of the day, or, at a minimum, more than standard work breaks would allow.  But, as the Commissioner points out, the statement is not nearly so explicit.  In fact, when Dr. Oppat gave the prescription, he assumed, albeit incorrectly, that Plaintiff was working at U-Haul: "As [Mr. Blanchard] is gainfully employed at the U-Haul distributor, which requires standing all day, the stockings are of the utmost importance."  (Tr. 228.)  Accordingly, the Court finds no reversible error

31

in the ALJ's failure to explicitly discuss Dr. Oppat's statement that Plaintiff should elevate his legs

when possible.[10]

Finally, Plaintiff asserts that the ALJ erred in concurring with a state agency physician's

opinion without adequate explanation.  Regarding Dr. Digby's July 2008 opinion, the ALJ stated:

> In accordance with Social Security Ruling 96-6p, the undersigned has considered the administrative findings of fact made by the state agency medical physicians and other consultants and weighed these opinions as statements from non-examining expert sources. The undersigned concurs with the overall state agency consultant's opinion that the claimant is not disabled and is capable of performing work at the light exertional level.

(Tr. 20.)  Plaintiff asserts that the ALJ "did not cite to any evidentiary support or give any reasons

why he concurred with the state agency physician" and, under *Blakely v. Comm'r of Soc. Sec.*, 581

F.3d 399 (6th Cir. 2009), the ALJ's failure-to-explain was error.

In *Blakely*, the ALJ failed to provide good reasons for failing to adopt the opinions of three

treating sources.  As to one, the ALJ failed to even mention the treating source; as to another, the

ALJ gave a "summary rejection" without explaining what weight he gave to the physician's

opinions; as to the third, the ALJ did not explain whether the physician's opinions were being

weighed "as an expert, a treater, or both."  581 F.3d at 408.  Yet the ALJ "adopted" the findings of

state agency physicians who did not have the opportunity to review over 300 pages of medical

records including the records of two of the treating sources.  *Id.* at 408-09.  The Court of Appeals

held that "'we require some indication that the ALJ at least considered these facts before giving

---

[10]Plaintiff argues that Dr. Oppat's statement at least supports his testimony.  Because the Court agrees with Plaintiff that the ALJ should reconsider Plaintiff's credibility, the ALJ, to the extent that he did not do so previously, should consider whether Dr. Oppat's prescription alters the credibility assessment.

greater weight to an opinion that is not based on a review of a complete case record.'" *Id.* (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

Plaintiff is correct that here, similar to *Blakely*, Dr. Rigby did not have the benefit of 90 pages of medical records that were produced after he provided his July 2008 opinion. And the Court agrees with Plaintiff that heavy reliance on Dr. Rigby's opinion to support an RFC assessment or to discount Plaintiff's credibility would be questionable in view of subsequent medical records and Plaintiff's later-arising multiple-sclerosis symptoms. Thus, the Court agrees with Plaintiff that this case is similar to *Blakely* in terms of the "staleness" of the state agency physician's opinions.

However, it is unlike *Blakely* in a critical respect. There, the ALJ did not give good reasons for rejecting treating source opinions and instead adopting state agency physician opinions. Here, the ALJ explained that he rejected Dr. Bortman's opinion because it was internally inconsistent. And, as the Commissioner has argued, the ALJ evaluated medical evidence after the state agency physician's opinion to formulate his own RFC (which is less restrictive than Dr. Rigby's opinion in several ways). Therefore, this case does not involve the situation in *Blakely* where the ALJ, without explanation and in violation of the treating-source rule, adopted the stale opinions of state agency examiners over the opinions of treating physicians. Rather, the ALJ gave a supportable reason for rejecting a treating-source physician opinion before buttressing his own RFC assessment with the opinion of a state agency physician. Accordingly, on these facts, the Court does not find that the ALJ committed reversible error by failing to explain why he concurred with the state agency physician.

33

### G.  Conclusion

For the foregoing reasons, this Court finds that some of the ALJ's reasons for discounting Plaintiff's testimony were either unsupported by substantial evidence or did not undermine Plaintiff's credibility.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART, that Defendant's Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  March 16, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 16, 2012.

s/Jane Johnson
Deputy Clerk